446 P.2d 504

George N. WILSON, as personal representative of Marie M. Totten, Deceased, Appellant,

v.

The CITY OF TUCSON, a municipal corporation, Appellee.

No. 2 CA–CIV 540.

Court of Appeals of Arizona.

Oct. 29, 1968.

Kain, Geyler & Bird, by Sidney L. Kain, Tucson, for appellant.

Chandler, Tullar, Udall & Richmond, by D. B. Udall, Tucson, for appellee.

MOLLOY, Judge.

The trial court granted the defendant City of Tucson's motion for summary judgment, holding that the City was not liable for an allegedly negligent failure of two of its policemen to arrest a driver whose subsequent acts caused the death of plaintiff's decedent. The issue before us is whether the trial court properly so ruled.

Before stating the facts, a preliminary explanation as to what we might call the "factual posture" of the case is

in order. It is, of course, a well-regarded rule that summary judgment is generally not appropriate in negligence cases. See Boozer v. Arizona Country Club, 102 Ariz. 544, 434 P.2d 630 (1967). Cognizant of that rule, and yet recognizing the desirability of a pretrial ruling on the basic liability issue in this case, plaintiff submitted a statement of the facts in his opposition to the motion for summary judgment. The source of these facts is for the most part deposition testimony of the police officers involved in the case and police records, which are attached to the plaintiff's memorandum and referred to under the "Facts" section of that document. Consequently, while the parties are at odds on the legal effect to be given to the facts, there is little dispute as to the essential facts.

The events and the tragedy with which we are concerned occurred on the Fourth of July, 1966. Sometime near 10 p. m., Officers Kampe and Rossetti of the Tucson Police Department, with the help of a third policeman, succeeded in subduing a 280-pound-drunk wrestler who was causing a disturbance at a local bar. This person was placed in the rear of the specially equipped combination transportation-and-cruising unit which Kampe and Rossetti were using on their patrol duty, for transportation to the City jail. Kampe and Rossetti then started to drive northward toward the jail on the Tucson Freeway access road.

As the police car was passing near 22d Street, an east-west artery, the officers heard a loud noise, and they immediately saw that a rear-end collision of two cars had taken place on 22d Street, some distance east of its intersection with the Freeway access road. The car which had been struck from the rear was slowly coming to a stop on 22d Street. The car, which was described by the officers as the "at fault" car, veered off northward from 22d Street at an uncertain speed over open terrain toward the rear of a gasoline service station located near the intersection of 22d Street and the Freeway access road.

Believing that the "at fault" (Chevrolet) car might be attempting to leave the scene of the accident, Kampe and Rossetti diverted the course of their vehicle toward the rear of the service station. At the same time they reported the accident and their belief concerning the Chevrolet car to police headquarters by radio. Since their immediate business was transporting their prisoner to jail, they requested that another officer be dispatched to the scene to investigate the accident.

The police car and the Chevrolet car converged in roughly opposing directions to the rear of the service station, until the Chevrolet car came to a stop. At that point, the parties agree that it was about 150 or 200 feet from the place of the accident on 22d Street. Officer Rossetti immediately approached the car. Its front end was badly damaged and its headlights were out. The driver emerged from the car and, on request, presented to Rossetti a 30-day driver's permit which identified the driver as Robert Ochoa. Rossetti took the permit but did not read it in detail.

Ochoa indicated that he wished to make a phone call, and asked Rossetti if he had change for a dollar. Rossetti referred Ochoa to the service station. They walked together toward the service station, since Rossetti was on his way to ascertain the condition of the people in the other car involved in the accident. Officer Kampe observed them walking together for some 25 to 40 feet. Neither Rossetti nor Kampe observed anything about Ochoa that indicated he was under the influence of alcohol. Neither considered that Ochoa had been placed under arrest.

When Rossetti reached the other car, he learned that a female passenger had been injured in the collision. At about this time, Kampe moved the police car nearer to that car. It was determined that an ambulance should be summoned, and either Rossetti or Kampe made the necessary radio call. After this, Rossetti attempted to render aid to the injured passenger, and Kampe was talking with the driver of

the rear-ended car. In a short time, a third policeman who had been dispatched to the scene arrived. It was then called to the officers' attention by a bystander that Ochoa had gotten back into his car and was driving at a rapidly accelerating speed toward the Freeway. Officer Kampe got back into the police car and took off in pursuit of Ochoa's vehicle. He also made a police radio broadcast of the chase and a description of the Ochoa car. He gave up shortly after losing ground to Ochoa at 70 to 80 miles per hour.

As appears from subsequent police reports, Ochoa drove north on the Freeway and exited to the northbound access road at the St. Mary's Road exit. He continued north on the access road, approaching its intersection with Speedway Boulevard. Another policeman, in another car, noticed the Ochoa car on the access road and took pursuit. It is undisputed that Ochoa, traveling at a high rate of speed, ran a red light at the Speedway intersection and crashed into an automobile driving east on Speedway, mortally injuring plaintiff's decedent, who was a passenger in the latter car. Ochoa died shortly after the collision. It was subsequently determined that he had a blood alcohol count of .17 at the time of autopsy. It also appears that the driver's permit given by Ochoa to Officer Rossetti was an invalid permit—issued and expired in 1963.

Plaintiff seeks to impose liability on the City of Tucson under the doctrine of *respondeat superior*. Specifically, plaintiff makes three contentions: (1) that the officers had an absolute duty to arrest Ochoa pursuant to A.R.S. § 28–1053(4); (2) that, in any event, since Ochoa had demonstrated a "propensity to attempt es-

cape," a jury could find that the policemen were negligent in failing to arrest and restrain Ochoa or to otherwise make use of his car difficult or impossible, as by removing the keys; (3) that, if it be held there was no such duty on the policemen in the circumstances, then it was negligent for the police to undertake a high-speed chase of Ochoa. Plaintiff states that he "* * * frankly has been unable to find any cases on point with the theory and proposition advanced here either for or against his position * * *" and argues mainly by analogy to cases in which a state has been held liable for damages to persons who have been injured by persons escaping from incarceration in state penal and mental institutions.

The position of defendant is that the policemen were under no duty to arrest Ochoa at any time prior to his flight, and that the facts shown by the record disclose no negligence on the part of the police officers which could be deemed to be the proximate cause of the death of plaintiff's decedent. Defendant obviously recognizes the unavailability of the former defense of sovereign immunity;[1] and defendant has made no attempt to urge the defense of official immunity.[2]

We may dispose quickly of plaintiff's contention that the officers had an absolute duty to arrest Ochoa at the scene of the accident. A.R.S. § 28–1053(4), as amended, relied upon by plaintiff in this regard, merely provides that a person who "is arrested" upon a charge of failure to stop in the event of an accident, causing personal injuries or property damage,[3] shall be immediately taken before a magistrate. The statute plainly provides a mandatory procedure to be followed where an

1. City of Phoenix v. Greer, 43 Ariz. 214, 29 P.2d 1062 (1934), holding a municipality was not liable for the acts of a police officer in the line of duty, rested upon the doctrine of sovereign immunity, abolished in Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107 (1963).

2. See Patterson v. City of Phoenix, 103 Ariz. 64, 436 P.2d 613 (1968); and com-

pare Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961), and Lipman v. Brisbane Elementary School District, 55 Cal. 2d 224, 11 Cal.Rptr. 97, 359 P.2d 465 (1961), on the question of a governmental agency's liability for official acts of its agents.

3. See A.R.S. §§ 28–661, 28–662 and 28–663.

arrest has been made; it is not concerned with when or under what circumstances an arrest may be made for the failure to stop. The purpose of A.R.S. § 28–1053 is not to provide a rule for the safety of persons or property. It has as its aim the prompt and orderly administration of criminal justice. Although an incidental benefit may be in some cases the temporary elimination of an offending driver from the streets, there is no express requirement of an actual, physical restraint of the person to insure accomplishment of the statutory purpose. The same can be said of driving under an expired license. The plaintiff is not a person who may enforce a liability for such a violation. Christy v. Baker, 7 Ariz.App. 354, 439 P.2d 517 (1968).

■ .The contention that plaintiff urges most strongly is that the police were negligent in failing to arrest and restrain or otherwise immobilize Ochoa in view of his alleged apparent "propensity to attempt escape." In considering this contention, we must, and we do, view the facts and any reasonable inferences to be drawn therefrom in the light most favorable to plaintiff. Elerick v. H. B. Rocklin Real Estate Investments, 102 Ariz. 78, 425 P.2d 103 (1967). But even giving maximum effect to that rule and maximum latitude to plaintiff's allegations, we are unable to see that the factual circumstances of this case can give rise to the liability asserted by plaintiff.

■ There can be no liability in a negligence case unless there is negligent conduct on the part of one which invades a protected legal interest of another who is "within the range of apprehension"[4] and which is the proximate cause of the injuries for which such other person claims damages. These three elements—negligence, an apprehensible interest, and proxi-

mate causation—blend into each other. Foreseeability plays a role in determining the presence or absence of all three elements.[5] It is in many case difficult, if not impossible to consider one of the elements apart from the others. With that in mind, we prefer to rest our decision here on the threshold question of whether the facts in this case disclose any breach of duty to the plaintiff's decedent on the part of the police officers.

■ Negligence is defined in the Restatement (Second) of Torts § 282 as "* * * conduct which falls below the standard established by law for the protection of others against *unreasonable risk of harm*." (Emphasis added.) Citing a related section of the Restatement, our Supreme Court in Tucker v. Collar, 79 Ariz. 141, 144, 285 P.2d 178, 180 (1955), defined "negligent conduct" thus:

"Negligent conduct is doing something that a reasonable person should realize involves an unreasonable risk of causing an invasion of an interest of another (damage to another) or failing to do something he is under a duty to do. Restatement, Torts, section 284."

The existence of a duty to the plaintiff is a prerequisite to tort liability. "There must be a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty." West v. Soto, 85 Ariz. 255, 261, 336 P.2d 153, 156 (1959).

We perceive no arguable negligence on the part of the policemen here. They were engaged in transporting a drunk and disorderly person to jail. That was their first order of business. They heard and then observed an accident and in the exercise of their duties diverted their course when they thought that the car which turned out to be Ochoa's might be leaving

4. The quoted language is from Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), at 162 N.E. 100, quoted in Tucker v. Collar, 79 Ariz. 141, 146, 285 P.2d 178, 181 (1955).

5. See Tucson Rapid Transit Co. v. Tocci, 3 Ariz.App. 330, 414 P.2d 179 (1966); Palsgraf v. Long Island R. Co., and Tucker v. Collar, supra n. 4; Restatement (Second) of Torts §§ 281 (particularly Comment h), 289, 435.

the scene. Ochoa stopped, got out of his badly damaged car, and appeared submissive to instructions of the officers. Ochoa surrendered his driver's permit. He stated his intention to make a telephone call, an act consistent with remaining at the scene. We think that, under those circumstances, plaintiff attempts to load the deck when he speaks of a "propensity to attempt escape."

■ The officers had an immediate duty to discharge toward the injured passenger in the other car. They attended to that duty. They had a prisoner in custody, which situation demanded some of their attention. They summoned another officer to the scene whose duty it would be to investigate the accident. Under the circumstances disclosed, we think that it must be held as a matter of law that the police were not guilty of a violation of a duty to the plaintiff's deceased in failing to use physical restraint on Ochoa.

.We do not think the two cases cited by plaintiff involving injuries inflicted by escapees from confinement are apposite. In Webb v. State of Louisiana, Through Dept. of Institutions, 91 So.2d 156 (La. App.1956), abundantly documented negligence on the part of prison authorities resulted in the escape of a criminal with a record of serious crimes of violence. The court stated at 91 So.2d 162 that "It was foreseeable that leaving a dangerous criminal unchecked for hours at night would give him an immediate opportunity to [escape] * * * * [and that] an armed * * * convict might shoot someone in the risk area while attempting to perfect an escape." In Finkel v. State, 37 Misc.2d 757, 237 N.Y.S.2d 66 (Ct. Claims 1962), a patient at a mental hospital escaped and thereafter attacked plaintiff's decedent. The patient was, by the hospital's own rules, one who was required to be kept under constant surveillance. The court noted that, insofar as third persons were concerned, the state stood in its relation to the mental patient in *loco parentis*. See Restatement (Second) of Torts §§ 316, 319. We have no quarrel with these cases and principles, but we do not find them applicable here.

Two authorities cited by defendant, United States v. Hutchins, 268 F.2d 69, 83 A.L.R.2d 447 (6th Cir. 1959), and Stanton v. State, 29 A.D.2d 612, 285 N.Y.S.2d 964 (1967), are closely analogous to the facts of this case. In both cases, a motorist who had been stopped by police authorities took flight and an ensuing high-speed chase ended in the fleeing motorist inflicting injuries on others. While both courts made the relevant portion of their decision turn on lack of evidence of proximate causation, both decisions held the police officers free of any liability.[6]

■ Plaintiff fares no better with his third contention. Plaintiff concedes that the chase itself was conducted without negligence. The scope of his position is limited to the narrow contention that the officers were negligent in attempting to arrest Ochoa after he departed the scene, the argument being made that, if they had no cause to arrest before this, they also had none after. It is at least debatable whether there was probable cause to arrest Ochoa for a violation of A.R.S. § 28–661 prior to his sudden departure. But, thereafter, the officers could consider his flight as an additional factor tending to indicate guilt. See State v. Rodgers, 103 Ariz. 393, 442 P.2d 840 (6/18/68). In any event, he was driving toward the Freeway at a high rate of speed and without any headlights in the dark of night. The courts have upheld, without any exception which has been called to our at-

---

6. The majority opinion in *Stanton* considers the allegedly negligent failure of the police to remove the keys from the driver's car at 285 N.Y.S.2d 966–967. Two dissenting opinions were filed in *Stanton,* but neither took exception to the majority's disposition of the issue here.

In *Stanton,* the additional contention was made that the chase was conducted in a negligent manner. Both dissents questioned the propriety of the officer's prolonged chase of the fleeing driver southward on the northbound lanes of a limited access "Quickway" at night.

tention, the right of the police to undertake a high speed chase of a law violator. See Hutchins v. United States, supra; Stanton v. State, supra; and Annot., 83 A.L.R.2d 452. We see no evidence here that would justify a finding that the police were negligent in undertaking a chase of Ochoa.

Judgment affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.